**AFFIDAVIT OF SPECIAL AGENT ERROL FLYNN**
**IN SUPPORT OF A CRIMINAL COMPLAINT**

I, ERROL C. FLYNN, state:

***INTRODUCTION AND AGENT BACKGROUND***

1. I am a Special Agent with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I am assigned to the Office of the Special Agent in Charge in Boston, Massachusetts. I am authorized to investigate crimes involving violations of Title 18, Title 8, and Title 19 of the United States Code. I have been employed as an HSI Special Agent since 2006. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training to become a federal agent. Specifically, I received certification in the Criminal Investigator Training Program and the ICE Special Agent Training Program. I received training there relating to the trafficking in persons, including sex trafficking, and other offenses.

2. Between 2002 and 2006, I worked as a Special Investigator with the Massachusetts Alcoholic Beverages Control Commission. I have also completed the intermittent Massachusetts Police Academy. I have an M.A. and a B.S. from the University of Massachusetts.

3. My current duties as an HSI Special Agent include conducting investigations involving, among other crimes, human smuggling and human trafficking. In my training and experience, I have become familiar with the methods, routines, and trends of human trafficking practices, including methods used by human trafficking and smuggling suspects to acquire and conceal assets with proceeds from these illegal activities. I am also familiar with the methods that human trafficking and smuggling suspects ("pimps") use to recruit, entice, transport, harbor,

smuggle, and arrange for victims to participate in commercial sex acts for the pimps' financial benefit.

4. I have debriefed and continue to debrief defendants, victims, informants, and witnesses who have personal knowledge about human trafficking, including sex trafficking, and other crimes occurring in Massachusetts, nationally, and abroad.

5. Based on my training and experience, I am aware that 18 U.S.C. § 1591 makes it a federal offense for any person to knowingly recruit, entice, harbor, transport, provide, obtain, or maintain by any means a person -- or benefit financially or by receiving anything of value from participating in a venture, which has engaged in these acts -- in or affecting interstate commerce, 1) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, or any combination of such means will be used to cause the person to engage in a commercial sex act; or 2) knowing that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act. I am also aware that under 18 U.S.C. § 1591(c), if a defendant had "a reasonable opportunity to observe the person so recruited, enticed, transported, provided, obtained or maintained, the Government need not prove the defendant knew the person had not attained the age of 18 years." I am aware that 18 U.S.C. § 1594 makes it a federal offense to conspire to or attempt to commit any violation of section 1591. I am further aware that pursuant to 18 U.S.C. § 2423, it is a federal offense for a person to knowingly transport an individual who has not attained the age of 18 years in interstate commerce with intent that the individual engage in prostitution.

***PURPOSE OF THE AFFIDAVIT***

6. I make this affidavit in support of a complaint charging that, between in or about

November 2013 and on or about December 22, 2013, in Boston and Cambridge, Massachusetts, in Baltimore, Maryland, and elsewhere, MARK PINNOCK; JUSTIN RICHARDSON, a/k/a "Jay", a/k/a "Jay Loyal Richardson"; MARTIN PINKNEY, a/k/a "Snugglez"; and others did:

a. in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, obtain, and maintain by any means a minor; and benefit, financially and by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1) of 18 U.S.C. § 1591(a)(1), knowing, and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion described in subsection (e)(2) of 18 U.S.C. § 1591, or any combination of such means would be used to cause the person to engage in a commercial sex act, and that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act, all in violation of 18 U.S.C. § 1591(a), (b)(1), and (b)(2);

b. knowingly and intentionally conspire with each other and others to violate 18 U.S.C. § 1591(a), (b)(1), and (b)(2) in violation of 18 U.S.C. § 1594; and

c. knowingly transport an individual who had not attained the age of 18 years in interstate and foreign commerce with intent that the individual engage in prostitution, and in any sexual activity for which any person can be charged with a criminal offense, in violation of 18 U.S.C. § 2423.

7. The statements contained in this affidavit are based on my own investigation, my review of reports, information that I have received from a variety of other sources, including public records, my analysis of reports prepared by other officers, and information provided to me by other law enforcement officers. Statements attributed to individuals are in substance and in part unless otherwise specifically indicated.

8. This affidavit is submitted for the limited purpose of establishing probable cause to believe that MARK PINNOCK; JUSTIN RICHARDSON, a/k/a "Jay", a/k/a "Jay Loyal Richardson"; MARTIN PINKNEY, a/k/a "Snugglez", and others committed the offenses described above. It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of this investigation.

## *PROBABLE CAUSE*

9. As set forth more fully below, the investigation to date provides probable cause to believe that between in or about November 2013 and on or about December 22, 2013, PINNOCK, PINKNEY, RICHARDSON, and others recruited, enticed, and then transported a then 15 year-old victim, identified herein as "Minor A," to travel from Baltimore, Maryland to Boston, Massachusetts, where Minor A then engaged in prostitution at two Boston area hotels.

*Minor A Rescued by the Cambridge Police Department*

10. On December 22, 2013 at approximately 4:30 p.m., law enforcement personnel went to the Courtyard by Marriott, 777 Memorial Drive, Cambridge, Massachusetts ("the Marriott"), after receiving a 9-1-1 call from Minor A's father indicating that his daughter, a 15-year old girl, was being held in Room 1506 at the Marriott against her will and that the person with Minor A had been selling her for sex with various clients.

11. Police officers, accompanied by Marriott security personnel, knocked on the door to Room 1506. A black male, later identified as PINNOCK, answered the door. Minor A, a reported missing child who matched the description of the subject of the 9-1-1 call, was seated on a bed in the hotel room.

12. Police officers interviewed Minor A privately in the bathroom of Room 1506 after

Minor A told them that she did not want PINNOCK to hear what she was going to say.

13. Minor A stated that she was fifteen years old and from Baltimore, Maryland. A few days earlier, a friend Minor A knew as "Jay" offered Minor A the opportunity to be an "escort." "Jay" told Minor A that he had a cousin in Boston who could get Minor A started in the escort business. Minor A stated that "Jay" also had another cousin in Baltimore, whom she knew as "Snugglez," who was also related to "Jay's" cousin in Boston.[1]

14. Minor A gave police officers telephone numbers she had for both "Jay" and "Snugglez". The telephone number Minor A gave for Snugglez was (443) 455-0333 ("the Snugglez Phone"). The telephone number Minor A gave for Jay was (443) 803-6968 ("the Jay Phone").

15. Minor A stated that either "Jay" or "Snugglez" arranged for a Greyhound bus ticket for her from Baltimore to Boston. Minor A left Baltimore on a 7:30 p.m. bus on December 19, 2013 and arrived in Boston in the early morning hours on December 20, 2013.

16. Minor A told police officers that PINNOCK met her at Boston's South Station,

[1]Minor A stated in this and in interviews in the days after her rescue that she did not understand what the escort business entailed and believed it to involve the drug trade. More recently, in a March 7, 2014 interview, Minor A indicated that she did appreciate the purpose for which she was traveling to Boston (i.e., to perform commercial sex acts). In my training and experience working with human trafficking victims, it is not unusual for minor victims to minimize their role in and knowledge of a sex trafficking venture out of embarrassment and fear. Especially in light of the investigation to date, which is described throughout this affidavit, Minor A's initial statements regarding the purpose of her trip do not affect my conclusion that Minor A was the victim of force, fraud, and coercion in connection with the charged offenses. Representatives of the U.S. Attorney's Office for the District of Massachusetts have advised me in any event that Minor A's knowledge of the purpose of the travel is irrelevant to a charge of sex trafficking of a 15-year old victim under 18 U.S.C. § 1591(b)(2) because she is not capable of consenting to participate in commercial sex acts.

taking her first to PINNOCK's mother's house and then to a Ramada Inn in Boston's Dorchester section ("the Ramada Inn"), where PINNOCK arranged for Minor A to perform commercial sex acts. Minor A felt she had no choice but to perform the commercial sex acts because PINNOCK had already paid for her trip to Boston and she did not have any money to return to Baltimore.

17. At the Ramada Inn, Minor A reported that PINNOCK took clothed and topless pictures of her using PINNOCK's cell phone. PINNOCK then arranged through Craiglist.org postings for Minor A to have sexual relations for a fee with approximately 10 male clients. Minor A stated that PINNOCK also used his cell phone to send pictures of her to prospective clients.

18. On December 22, 2013, after Minor A had performed sex acts for a fee at the Ramada Inn, PINNOCK and Minor A checked out of the Ramada Inn. PINNOCK drove Minor A in a silver Lexus to the Marriott, where they checked into Room 1506. Minor A performed a single sex act for a fee at the Marriott. Minor A stated that a black woman who accompanied them to the Marriott (identified in this affidavit as "T.H.") collected the fee from Minor A's client at the Marriott. Minor A also stated that T.H. had instructed Minor A on how to perform certain sex acts.

19. Minor A stated that PINNOCK falsely told clients that Minor A was 20. Minor A also stated that PINNOCK told her that he (PINNOCK) was the only way Minor A would able to return home. Minor A also stated that PINNOCK took her to parties to meet prospective clients.

20. Left alone in Room 1506 shortly before 4:30 p.m. on December 22, 2013, Minor A, who did not have a cell phone, stated she was able to call her father and request help.

21. Based on this information, law enforcement personnel arrested PINNOCK and charged him with several violations of Massachusetts law, including human trafficking,

kidnapping, deriving support from child prostitution, inducing a minor into prostitution, and accessory before the fact to statutory rape.

22. At the hotel, PINNOCK initially stated to arresting officers that Minor A was at the Marriott "on her own" and that PINNOCK had taken her to the Marriott and paid for the room because "someone asked me". PINNOCK stated that his "cousins" had called him and asked him to pick up a girl at Boston's bus station. PINNOCK stated that he knew Minor A by her first name and knew that she was 15 years old. PINNOCK stated that one of his cousins who had contacted him regarding Minor A was "Jay" --- the same name that Minor A had also used for a person who recruited her --- but otherwise refused to provide any other information about his cousin or his cousin's involvement with Minor A. PINNOCK also stated that T.H. had been in the room with Minor A and PINNOCK.[2]

23. Law enforcement personnel seized certain evidence from the Marriott, including a piece of white notebook paper with the following written information on it: "Mark 617-818-5474" (which turned out to be the telephone number assigned to PINNOCK's cell phone), "Snugglez 443-455-0333" (i.e., the Snugglez Phone), and "Jay 443", the name Minor A had given for one of her recruiters.

24. Law enforcement personnel also seized from the hotel room a Peter Pan bus check tag bearing Minor A's name, the number 21187344 (also written on the note paper described in the

[2]Later on December 22, 2013, PINNOCK gave a second interview at the Cambridge Police Department in which he stated that he believed Minor A was 20 and denied any involvement in the commercial sex acts that Minor A performed at the Ramada or the Marriott. I believe based on the evidence obtained in the investigation to date described below that PINNOCK was not fully truthful during his second interview with police officers. PINNOCK did, however, identify "Snugglez" as his cousin, MARTIN PINKNEY, and stated that "Jay" and PINKNEY asked him to purchase a bus ticket for Minor A and to pick her up at Boston's South Station.

paragraph above), and the phone number (443) 803-6968 (the number that Minor A had given for "Jay").

25. Law enforcement personnel also received phone records for Room 1506 at the Marriott that showed phone calls from the hotel room to 443-803-6968 ("the Jay Phone"); to Minor A's home; and to the cell phone of Minor A's stepmother.

*December 23, 2013 Interview with Minor A*

26. On December 23, 2013, law enforcement personnel interviewed Minor A again. Minor A stated that she met "Jay" for the first time one to two years earlier in the area of Mount and Hollins Streets in Baltimore. Minor A described Jay as an approximately 5' 6"-tall black male with tattoos on his hands, arms, and face (including two tear drops tattooed under one of his eyes). Minor A and Jay began to communicate over Facebook. Jay's Facebook account used the name "Jay Loyal Richardson".

27. Minor A also stated that she met Jay's cousin, "Martin," who went by the name "Snugglez". Minor A stated that she often hung out with "Jay" and "Snugglez" at "Snugglez's" house, which was located at Hollins House, 1010 West Baltimore Street, Apartment 220, Baltimore, Maryland ("the Hollins House Apartment"). Minor A identified "Snugglez" Facebook account as Snugglez.Ru, although Minor A did not communicate with "Snugglez" over Facebook.

28. Minor A stated that she had met with "Snugglez" and "Jay" at the Hollins House Apartment the Tuesday before she traveled to Boston (December 17, 2013), and that "Snugglez" and "Jay" had proposed that Minor A travel to Boston to "escort" there and that "Snugglez's"

cousin would explain further when Minor A arrived in Boston.[3]

29. After Minor A agreed to their proposal (i.e., to "escort"), Minor A stated that both "Snugglez" and "Jay" took naked photographs of Minor A in the bathroom and on the tan or vanilla-colored couch in the living room of the Hollins House Apartment. Minor A described the bathroom as having a handicapped accessible bathtub and a blue shower curtain. ("Snugglez" was in a wheelchair, Minor A stated). Both "Snugglez" and "Jay" instructed Minor A on how to pose, and each of them used a cell phone to take pictures of her (and showed her the pictures that they had taken). Minor A stated that "Snugglez" and "Jay" also sent the pictures to "Mark," the person she later met in Boston (i.e., PINNOCK).

30. Minor A stated she smoked marijuana and drank both before and after taking the pictures[4] and stayed at the Hollins House Apartment for several days before leaving for Boston. "Snugglez" and "Jay" told her that "Mark" would get her a bus ticket and look after her in Boston. Both men stated they would meet up with Minor A in Boston after January 1, 2014. "Jay" provided Minor A with $20 to take a taxi to the Baltimore bus station.

*Records from Greyhound Lines*

31. I have reviewed records obtained from Greyhound Lines ("Greyhound"), a bus company that I am aware through my investigation offers interstate bus travel service throughout the United States. Greyhound's records indicate that on December 19, 2013, at approximately 5:32 p.m., a bus ticket was purchased by phone for travel in the name of Minor A from Baltimore to Boston. The records included boarding passes issued to Minor A for travel to Boston from

[3]See note 1 above.

[4] In a later interview, Minor A also stated that Jay or Snugglez provided her with another drug, MDMA.

Baltimore departing at 7:30 p.m. on December 19, 2013 and arriving at Boston's South Station at 5:00 a.m. on December 20, 2013.

32. The telephone number provided in connection with the reservation was (443) 803-6968 (i.e., the Jay Phone). The $106.50 fare was paid for with a Visa card expiring in May 2017, and the provided billing address was "MARK PINNICK" of Boston, Massachusetts. (I have reviewed a Bank of America statement for an account in the name of MARK A. PINNOCK that shows a $106.50 check card purchase payable to Greyhound Lines with a posting date of December 23, 2013, which there is probable cause to believe represents PINNOCK's payment for Minor A's bus ticket).

*Records from Backpage*

33. Records obtained from Backpage, an online social network that I am aware based on my training and experience investigating sex trafficking is used to solicit customers for prostitutes, show that a posting was created on Backpage at approximately 5:00 p.m. on December 20, 2013 (the day Minor A arrived in Boston). The posting contained photographs of Minor A under the headline "Good for Everything ... Pleasure Unlimited ... Discrete Playmate ($80 special ask for) – 20". The ad had been placed using PINNOCK's name and Boston address. The posting instructed would-be customers to call the telephone number (617) 818-5474, which was later determined to be PINNOCK's cell phone number.

34. Two of the photographs associated with the December 20, 2013 Backpage advertisement depicted Minor A naked from the waist up with her back to the camera. Investigators determined that the bedspread in one of these photographs matched the bedspreads used throughout the Ramada Inn in Dorchester, where PINNOCK took Minor A.

35. Two other photographs associated with the December 20 Backpage ad also depicted Minor A. In one, Minor A stands completely naked with her back to the camera, looking over her shoulder, and bent over a bathtub with handicap rails and a blue shower curtain. Based on Minor A's description of the Hollins House Apartment, there is probable cause to believe that this photograph was taken in the Hollins House Apartment and then forwarded to PINNOCK, who posted the photograph on Backpage.

36. The second photograph depicted Minor A posing topless in front of the same bathroom shower, which I again believe based on the investigation to date to be in the Hollins House Apartment.

37. According to Backpage's records, PINNOCK paid $12 for the December 20 ad via credit card. PINNOCK's Bank of America account statement for December 2013 shows a December 23, 2012 check card charge for $12 to "BP Classified", which there is probable cause to believe is the payment for the Backpage ad depicting a naked Minor A in the Hollins House bathroom.

*PINNOCK's Cell Phone*

38. Upon arresting PINNOCK, law enforcement personnel seized a black Samsung Galaxy cell phone ("the Samsung") from PINNOCK's person.[5]

39. On January 14, 2014, law enforcement personnel applied to Robert Gorman, an Assistant Clerk of the Cambridge District Court, for a warrant to search the contents of the

[5] They also later seized from a silver 2006 Lexus in the Marriott's parking lot a laptop, PINNOCK's wallet, and a sealed money envelope containing $670 in cash in nine separate bundles. The bundles were in the following denominations: $20, $100, $80, $100, $100, $90, $20, $60, and $100.

Samsung for evidence of trafficking for sexual servitude, deriving support from the earnings of a minor prostitute, posing a child for sexual photographs (manufacturing), disseminating child pornography, and possession of child pornography. The requested warrant issued at 3:00 p.m. that day.

40. Forensic review of the Samsung revealed it be assigned the telephone number (617) 818-5474 and to contain extensive evidence of PINNOCK's knowledge of and involvement in the sex trafficking of Minor A.

*Photographs of Minor A Taken in Baltimore*

41. Records from PINNOCK's Samsung showed that on December 18, 2013 at 1:19 p.m., the day before Minor A traveled to Boston, the Jay Phone was used to send a text message to PINNOCK's cell phone ("the December 18 Text Message").

42. Attached to the December 18 Text Message were five photographs: (1) two digital photographs of a partially clothed Minor A and a topless unidentified female ("UF") seated on a couch;[6] (2) two additional photographs of a naked or semi-nude UF on the same couch; and (3) a photograph taken outdoors of RICHARDSON.

43. I have reviewed the photographs sent via the December 18 Text Message. The couch on which Minor A is seated matches Minor A's description of the couch on which she stated that "Snugglez" and "Jay" photographed her.

44. PINNOCK's phone also contained several versions of the two photographs of a naked Minor A posing in a shower stall that PINNOCK posted to Backpage on December 20,

[6]In a March 7, 2014 interview, Minor A told law enforcement personnel that a second woman whose name she did not know was supposed to travel with her to Boston but did not. Minor A was told that woman was 20 (and had been instructed to tell UF that Minor A was 19).

2013.

45. PINNOCK's cell phone also contained the "Inbox", "Sent Mail", "Trash", and "Uncategorized" folders related to the e-mail account PINNOCKMARK@[provider1].com ("the PinnockMark Account").

46. Among the e-mails were several e-mails addressed to the PinnockMark Account setting forth what appear to be work schedules for a car dealership, where PINNOCK stated to arresting officers that he worked.

47. On December 20, 2013 at 10:22 a.m., the day that Minor A arrived in Boston, the PinnockMark Account also received a registration confirmation from room.reservations@wyndhamworldwide.com. That reservation, under the guest name "MARK PINNOCK", was for the Ramada Boston, located in Boston's Dorchester section (i.e., the same hotel to which PINNOCK took Minor A). The reservation was for check-in that day, December 20, 2013, for two nights. (PINNOCK's Bank of America statement for December 2013 shows a $287.16 check card charge from "Ramada Inn Boston", the exact amount of an invoice issued to PINNOCK on December 22, 2013 that investigators obtained from the Ramada).

48. Beginning at approximately 12:15 p.m. on December 21, 2013 (a day that Minor A stated she spent at the Ramada Inn performing commercial sex acts), the PinnockMark Account was used to exchange e-mails with an individual who appeared to be responding to a Craigslist.org post ("craigslistreply9d45"). In sum and substance, the PinnockMark Account was used to tell craiglistreply945 that the user of the PinnockMark Account was at the "Ramada Inn" in "Dorchester". Craigslistreply9d45 stated that it was in "Brockton," [Massachusetts]. The e-mail chain involving the PinnockMark Account also included an exchange of questions at

approximately 9:00 p.m. on December 21, 2013: "How much u got for me I can come" [from the PinnockMark Account] and "How much u looking for to come" [from craigslistreply9d45], which I believe based on my training and experience investigating sex trafficking to be a negotiation over the price of an "out call" (i.e., a trip to Brockton for prostitution). At 8:59 p.m., the PinnockMark Account was used to reply, "120 [i]f I come to you", which I again believe based on my training and experience to be a price quote from the PinnockMark Account to craiglistreply9d45 for an "out call" to Brockton involving Minor A.

49. At 2:30 a.m. on December 22, 2013, craigslistreply9d45 asked "what can we do." The reply from the PinnockMark Account was "ab[n]y thing but anal," which I believe based on my training and experience investigating sex trafficking to be a reference to sex acts, excluding, however, anal sex.

*Records from Craigslist*

50. Records obtained from Craigslist.org, another online social network that I am aware based on my training and experience investigating sex trafficking is used to solicit customers for prostitutes, show that a series of at least five postings were created between December 20, 2013 at 10:24 p.m. (EST) and December 22, 2013 at approximately 3:00 a.m., all times during which PINNOCK was the registered guest at the Ramada.

51. All five Craigslist posts contained PINNOCK's cell phone number, (617) 818-5474, as a contact number.

52. Four of the five posts used the PinnockMark Account as the e-mail account to register the posts.

53. A Craigslist post created on December 21, 2013 at 1:01:18 p.m. (EST) contained

two photographs of Minor A: (1) one of the naked photographs of Minor A posing in the bathroom stall with handicapped access rails and blue shower curtain; and (2) one of the photographs depicting Minor A on the bedspread at the Ramada that was also used on the December 20 Backpage posting described above. (Both of these images were also recovered from PINNOCK's phone.)

*Chats from PINNOCK's Cell Phone*

54. Several of the text messages seized from PINNOCK's cell phone show that PINNOCK was aware of and coordinating Minor A's commercial sex activities at the Ramada and later at the Marriott.

55. For example, beginning at 6:07 p.m. on December 20, 2013, PINNOCK's phone exchanged a series of SMS (text) messages with a phone listed in PINNOCK's address book as belonging to "Drew":

| TIME (EST) | FROM | TO | TEXT |
|---|---|---|---|
| 6:07 p.m. | "Drew" | (617) 818-5474 | She doin good number |
| 6:17 p.m. | (617) 818-5474 | "Drew" | This dude got a fetish wit dogs he's said 600 |
| 6:19 p.m. | "Drew" | (617) 818-5474 | lol how would that work |
| 6:20 p.m. | (617) 818-5474 | "Drew" | Don't know but we'll find out |
| 8:19 p.m. | "Drew" | (617) 818-5474 | Is she clockin good $$$???? |
| 8:19 p.m. | (617) 818-5474 | "Drew" | Niggas keep bullshitting |
| 8:26 p.m. | "Drew" | (617) 818-5474 | Damn!!! Well i told you what happened wit my chick... recently..... the holiday season seems scarce... but you'll be good after december..... i |

| | | | |
|---|---|---|---|
| | | | happy for you though, just stay sharp... |
| 8:27 p.m. | (617) 818-5474 | "Drew" | Yea I hip mad niggs is hit me up but tge bull shittin |

56. I believe based on my training and experience investigating sex trafficking matters that PINNOCK was complaining to "Drew", a fellow pimp, that the calls PINNOCK was fielding for Minor A were not leading to enough business, and that "Drew" was referring to Minor A when Drew's message asked if "she" was "clocking good $$$".

57. At 9:10 p.m., PINNOCK's phone exchanged text messages with an (857) telephone number that PINNOCK's girlfriend and the mother of his child, gave to law enforcement personnel. The telephone was listed in the PINNOCK cell phone's address book as "My Queen":

| TIME (EST) | FROM | TO | TEXT |
|---|---|---|---|
| 9:10 p.m. | My Queen | (617) 818-5474 | Is it still slow |
| 9:10 p.m. | (617) 818-5474 | My Queen | yup nobody yet |
| 9:22 p.m. | My Queen | (617) 818-5474 | SO what you doin |
| 9:22 p.m. | (617) 818-5474 | My Queen | postin ads |
| 9:29 p.m. | My Queen | (617) 818-5474 | [NICKNAME] sleepin I'm listening to music relaxing |

58. I know from the investigation to date that the name in the 9:29 p.m. text from "My Queen" is a name that PINNOCK and his girlfriend regularly use to describe their newborn child. PINNOCK's exchange with his girlfriend provides probable cause to believe that it was PINNOCK who was "postin ads" (on Craigslist) advertising Minor A's commercial sex services. (In fact, approximately 1 hour before PINNOCK told his girlfriend that he was "postin ads", Internet records from PINNOCK's cell phone indicate that it was used to navigate to

Craiglist.org.)

59. Similarly, on December 21, 2013, in a separate exchange of text messages with a telephone number listed in the PINNOCK's phone as belonging to T.H.'s first name, PINNOCK and T.H. discussed Minor A's completion of sex acts with customers:

| TIME (EST) | FROM | TO | TEXT |
|---|---|---|---|
| 11:19 p.m. | (617) 818-5474 | T.H. | Did some come in the room yet for her |
| 11:34 p.m. | T.H. | (617) 818-5474 | OK I see them they comin in |
| 11:52 p.m. | (617) 818-5474 | T.H. | Yo she almost done |
| 11:52 p.m. | T.H. | (617) 818-5474 | yeah she is |
| 11:55 p.m. | (617) 818-5474 | T.H. | Ok I got somebody else pose to come in 20 min |

60. Similarly, PINNOCK's cell phone shows other communications between PINNOCK and T.H. that were related to the commission of sex trafficking.

61. On December 22, 2013 at 1:48 p.m., T.H. sent a text to PINNOCK's cell phone requesting what I believe based on the investigation to date and my training and experience investigating sex trafficking cases to have been a photograph of Minor A's genitals ("the pussy you took of her, send it to me"). Shortly thereafter, PINNOCK's phone did text a photograph of what appear to be female genitalia to T.H.

62. Finally, a series of text messages between PINNOCK and T.H. on December 22, 2013, shortly before PINNOCK was arrested in Room 1506 at the Marriott, provide probable cause to believe that PINNOCK, as Minor A told law enforcement personnel, denied Minor A any of the proceeds of her commercial sex acts and any opportunity to eat:

| TIME (EST) | FROM | TO | TEXT |
|---|---|---|---|
| 3:11 p.m. | T.H. | (617) 818-5474 | cindy wants to kno if she can order a pizza |
| 3:14 p.m. | (617) 818-5474 | T.H. | How much is the pizza |
| 3:14 p.m. | T.H. | (617) 818-5474 | not sure she haven't looked yet |
| 3:15 p.m. | (617) 818-5474 | T.H. | Let me know the price of it |
| 3:32 p.m. | T.H. | (617) 818-5474 | 33.50 |
| 3:34 p.m. | (617) 818-5474 | T.H. | hell no for pizza |
| 3:36 p.m. | (617) 818-5474 | T.H. | She order by accident cuz she thought it be ok n she said she will make extra money to cover it |

63. A telephone call then followed immediately between PINNOCK and T.H.

64. At 3:47 p.m., PINNOCK texted, "I'll bring her some food when I come."

65. At 3:47 p.m., T.H. replied: "She doesn't want u too". When PINNOCK asked "why not," T.H. replied, "she cant cancel the order n she dont want to be rude."

66. Three phone calls followed in quick sequence from PINNOCK to T.H., which appear to me to have gone unanswered by T.H. because PINNOCK then texted (at 3:54 p.m.): "Don't wonna answer fine imma a security escort u out".

67. Although more calls followed between T.H. and PINNOCK, I believe T.H. left Room 1506 shortly after texting the following to PINNOCK at 4:05 p.m.: "U being a real bitch over some fuckin pizza bye nigga". (This phone traffic is consistent with an argument that Minor A described between PINNOCK and T.H. that led to Minor A being left alone in Room 1506.) Minor A was rescued approximately 30 minutes later.

*Records Linking PINNNOCK, RICHARDSON, and PINKNEY*

68. Beyond PINNOCK'S acknowledgement of his connection to RICHARDSON and PINKNEY, my review of PINNOCK's cell phone revealed substantial additional evidence connecting PINNOCK, RICHARDSON, PINKNEY and the scheme to traffic Minor A to Boston, beginning on December 18, 2013, the day after Minor A was first reported missing.

69. On December 18, 2013, at 2:14 and 2:28 a.m., PINKNEY's Snugglez Phone [(443) 455-0333][7] placed two calls to PINNOCK's cell phone, (617) 818-5474. In PINNOCK's cell phone, the Snugglez Phone is listed as "Martin", PINKNEY's first name.

70. According to T-Mobile toll records for PINKNEY's Snugglez Phone, at 8:32 and 8:33 that morning, the Snugglez Phone sent two MMS (multimedia messaging service) messages, which typically consist of digital images, to PINNOCK's phone.

71. Between 11:06 a.m. and 12:13 p.m., PINKNEY's phone exchanged numerous phone calls and text messages with PINNOCK.

72. As noted above, at approximately 1:19 p.m., the Jay Phone (believed to be RICHARDSON's for reasons stated below) messaged photographs of Minor A and UF to PINNOCK via the December 18 Text Message.

73. Six minutes after RICHARDSON's Jay Phone sent these photos, at 1:25 p.m.,

[7] I base my conclusion that the Snugglez Phone belongs to and was used by PINKNEY on both Minor A's identification of PINKNEY as "Martin" and "Snugglez"; her providing the Snugglez Phone number as belonging to Martin; the presence of the Snugglez Phone under "Martin" in PINNOCK's cell phone; PINNOCK's statement that PINKNEY was his cousin who asked him to pick up Minor A at Boston's South Station; and my review of records pertaining to the Snugglez.Ru Facebook Account, which Minor A identified as belonging to Snugglez, which lists a contact e-mail as pinkneymartin@[provider2].com (PINKNEY's last and first names), and which displays as of the date of this affidavit a cover photograph that matches known photographs of PINKNEY. Additionally, there is a January 1, 2014 Facebook message in the Snugglez.Ru Facebook Account in which the subscriber to the Snugglez.Ru Facebook Account directs a friend to call 443-455-0333 (i.e., the Snugglez Phone).

PINKNEY's phone was used to call PINNOCK.

74. Between 2:14 p.m. and 3:36 p.m., PINKNEY's phone and PINNOCK's phone exchanged more phone calls and messages.

75. At approximately 5:26 p.m., PINNOCK's phone was used to create screenshots of naked photos of Minor A. The naked photographs, taken in front of the blue shower curtain and handicapped access rails, were nearly identical to photographs that PINNOCK posted on the December 20 Backpage ad two days later.

76. At approximately 10:30 p.m. and 11:30 p.m., PINNOCK's phone was used to send four MMS messages back to PINKNEY's Snugglez Phone.

77. The following day, December 19, 2013, was the day that Minor A traveled to Boston by Greyhound Lines. There are several contacts between PINNOCK and PINKNEY's respective phones throughout the day, beginning with a phone call from PINKNEY's phone to PINNOCK at 7:09 a.m. Thereafter, the following activity occurs, according to the logs in PINNOCK's phone:

| DATE | TIME (EST) | FROM | TO |
|---|---|---|---|
| 12/19/2013 | 15:32 | Samsung/PINNOCK | Snugglez Phone/PINKNEY |
| 12/19/2013 | 16:55 | Samsung/PINNOCK | Snugglez Phone/PINKNEY |
| 12/19/2013 | 17:01 | Samsung/PINNOCK | Website for Peter Pan Bus Lines |
| 12/19/2013 | 17:03 | Samsung/PINNOCK | Telephone for Peter Pan Bus Lines |
| 12/19/2013 | 17:05 | Samsung/PINNOCK | Website for Megabus |
| 12/19/2013 | 17:08 | Samsung/PINNOCK | Telephone for Megabus |
| 12/19/2013 | 17:17 | Samsung/PINNOCK | Website for Greyhound Lines |
| 12/19/2013 | 17:18 | Samsung/PINNOCK | Telephone for Greyhound Lines |

| | | | |
|---|---|---|---|
| 12/19/2013 | 17:26 | Samsung/PINNOCK | Website for Greyhound Lines |

78. At 5:32 p.m., as noted above, Greyhound Lines records indicate that a "Mark Pinnick" purchased a one-way bus ticket from Baltimore to Boston for Victim A. The telephone number provided in connection with the reservation was 443-803-6968 (i.e., the Jay Phone). At 5:32 p.m., almost immediately upon completing the purchase of the bus ticket for Minor A, PINNOCK called PINKNEY's phone:

| DATE | TIME (EST) | FROM | TO |
|---|---|---|---|
| 12/19/2013 | 17:32 | Samsung/PINNOCK | Snugglez Phone/PINKNEY |
| 12/19/2013 | 17:36 | Samsung/PINNOCK | Snugglez Phone/PINKNEY |
| 12/19/2013 | 17:39 | Snugglez Phone/PINKNEY | Samsung/PINNOCK |
| 12/19/2013 | 17:40 | Snugglez Phone/PINKNEY | Samsung/PINNOCK |
| 12/19/2013 | 18:00 | Samsung/PINNOCK | Snugglez Phone/PINKNEY |
| 12/19/2013 | 19:01 | Snugglez Phone/PINKNEY | Samsung/PINNOCK |
| 12/19/2013 | 19:11 | Snugglez Phone/PINKNEY | Samsung/PINNOCK |
| 12/19/2013 | 19:13 | Snugglez Phone/PINKNEY | Samsung/PINNOCK |
| 12/19/2013 | 19:14 | Snugglez Phone/PINKNEY | Samsung/PINNOCK |

79. At approximately 7:30 p.m., fifteen minutes after the last of this series of calls from PINKNEY to PINNOCK, Minor A's Greyhound bus left from Baltimore's bus station for Boston (via New York City).

80. Just five minutes later, at 7:35 p.m., PINNOCK's Samsung called PINKNEY's Snugglez Phone again.

81. Minor A's bus arrived in Boston the following morning, December 20, 2013, at approximately 5:00 a.m.

82. At 5:14 a.m., PINKNEY's Snugglez Phone called PINNOCK's Samsung.

83. Based on these communications and Minor A's statements regarding Snugglez's and Jay's involvement in her transportation to Boston, and especially given the timing of the calls between the Samsung and the PINKNEY's Snugglez Phone and PINNOCK's statement that he spoke to PINKNEY about Minor A, there is little doubt that PINNOCK and Snugglez/PINKNEY were communicating regarding Minor A's travel.

84. Even after Minor A arrived in Boston, communications continued between Boston (either Minor A or PINNOCK) and PINKNEY and RICHARDSON.

85. On December 21, 2013, two calls were placed from PINNOCK and Minor A's Room 332 at the Ramada to (443) 803-6968 (RICHARDSON's Jay Phone), and two more calls were placed to (443) 455-333 (PINKNEY's Snugglez Phone).

86. Records from the Marriott and from Sprint Corporation (the provider for RICHARDSON's Jay Phone) from December 22, 2013 show that two calls were placed from Room 1506 to RICHARDSON's Jay Phone at approximately 4:06 p.m. and 4:17 p.m., minutes before and minutes after Minor A called her father for help, and minutes before Cambridge Police Department officers rescued Minor A and arrested PINNOCK.

87. On December 22, 2013 at 9:49 p.m. and again at 10:03 p.m., several hours after PINNOCK was arrested, a phone number that PINNOCK's mother gave to police officers as hers was used to call RICHARDSON's ("Jay") phone twice.

88. The extent of these and other communications involving RICHARDSON below provide probable cause to believe that RICHARDSON and PINKNEY were involved in the purpose of Minor A's travel to Boston (i.e., the commission of commercial sex acts).

*Minor A Identifies PINKNEY and RICHARDSON*

89. On February 3, 2014, Minor A identified a known photograph of PINKNEY as the wheelchair-bound person she knew as "Martin" or "Snugglez". The photograph of PINKNEY that Minor A selected resembled photographs of a wheelchair-bound individual depicted in the Facebook Account "Snugglez.Ru," which is the Facebook account that Minor A identified as belonging to "Snugglez".

90. On February 21, 2014, Minor A identified a known photograph of RICHARDSON from a series of photographs shown to her as the individual she had known for more than a year as "Jay". The photograph Minor A selected also appeared to match the individual in the photograph of RICHARDSON attached to the December 18 Text Message (sent from the Jay Phone to PINNOCK's phone along with pictures of Minor A and UF) and photographs found on a Facebook account in the name of Jay Loyal Richardson ("the JLR Facebook Account").

*The JLR Facebook Account*

91. I have reviewed records produced by Facebook, an online social network, regarding a Facebook account with the vanity name CCKAUT1ONRU. According to Facebook, however, the first, middle, and last names associated with this account are "Jay Loyal Richardson".

92. The e-mail address associated with the JLR Facebook Account contains both RICHARDSON's first and last name: justin.richardson78@[provider2].com.

93. In several instances, the JLR Facebook Account contained records linking it to the Jay Phone, (443) 803-6968, that was used to traffic Minor A to Boston. For example, on December 31, 2013, the JLR Facebook Account was used to send the following message to

another Facebook user: "Wya tmp 443-803-6968", which I believe to mean "Where you at? Text me please [at] 443-803-6968." Similarly, on December 12, 2013, RICHARDSON directed a Facebook friend to text him: "Tmp [text me please] 443-803-6968 text me I can't talk on my shit rite now I can't hear". The JLR Facebook Account similarly requested calls to the Jay Phone on, among other dates, November 26, November 28, November 30, December 9 (twice), December 17, December 18 (three times), December 19, December 20, December 23, and December 31, 2013 and January 1, 2014. There is accordingly probable cause to believe that RICHARDSON controlled both the JLR Facebook Account and the Jay Phone.

94. The JLR Facebook Account contained several uploaded photographs of the individual who Minor A identified as "Jay". These uploaded photographs also matched the individual depicted in a known booking photograph of RICHARDSON from June 2013, providing further probable cause to believe that RICHARDSON controlled the JLR Facebook Account.

95. The JLR Facebook Account also contained several records linking it to the sex trafficking of Minor A. Most notably, it contained a naked photograph of Minor A seated on the same style of couch that appeared in the photographs of Minor A and UF sent by text message from RICHARDSON's Jay Phone (i.e., the December 18 Text Message).

96. The account also contains what appear to be the photos of UF and Minor A that were included in the December 18 Text Message. According to Facebook's records, these pictures were uploaded to the JLR Facebook Account at approximately 1:06 p.m., just 13 minutes before the Jay Phone was used to send the December 18 Text Message to PINNOCK.

97. The JLR Facebook Account also contained the contents of messages with other female Facebook users that invited them to travel to Boston on or about December 18, 2013 and

December 19, 2013, the same day that Minor A traveled to Boston. For example, at 9:48 a.m. on December 18, 2013, the JLR Facebook Account was used to send a message to an account in the name of "A.H": "Wanna go to Boston with me?," the message stated. At 2:12 p.m. that day, the JLR Facebook Account was again used to message the user "A.H.": "Ok and u can come back. Its just I'm tryna get u away out Boston". At 4:13 p.m., the account messaged A.H. again: "Matter fact u wanna go out Boston <u>today</u>" (emphasis supplied) and instructed A.H. to come back at "5", which was shortly before Minor A left Baltimore for Boston. There is accordingly probable cause to believe that RICHARDSON (the user of the JLR Facebook Account) was recruiting other women to travel to Boston in furtherance of a sex trafficking scheme.

98. The Jay Loyal Richardson Facebook Account also contains records evidencing extensive communications between it and a Facebook account that Minor A used regularly. The Facebook records show that more than approximately 320 messages were exchanged between Minor A and RICHARDSON over Facebook beginning in late November 2013. Approximately 175 of these messages were exchanged <u>after</u> Minor A left Baltimore for Boston and before PINNOCK was arrested. All of these messages, however, were deleted from the JLR Facebook Account. Based on the investigation to date, it appears that RICHARDSON deleted them at the same time that he "removed" Minor A as a Facebook friend (see immediately below) in an effort destroy evidence of his crimes.

99. Records from Facebook indicate that the subscriber to the JLR Facebook Account removed Minor A's Facebook Account as a friend on December 24, 2013 at 7:56 p.m. (EST). Because this action was taken less than 48 hours after PINNOCK was arrested in Boston, and following calls from PINNOCK's mother's phone to RICHARDSON's Jay Phone, I believe based

on my training and experience that RICHARDSON both removed Minor A as a Facebook friend and deleted the substance of their messages to each other to destroy evidence that might tend to incriminate him.

## *CONCLUSION*

100. Based on the foregoing, I submit that there is probable cause to believe that between in or about November 2013 and on or about December 22, 2013, MARK PINNOCK; JUSTIN RICHARDSON, a/k/a "Jay", a/k/a "Jay Loyal Richardson"; MARTIN PINKNEY, a/k/a "Snugglez"; and others did engage in sex trafficking of a minor through force, fraud and coercion, in violation of 18 U.S.C. § 1591, conspired with each other and others to do so, in violation of 18 U.S.C. § 1594, and transported a minor in interstate commerce for the purpose of prostitution, in violation of 18 U.S.C. § 2423.

Respectfully submitted,

ERROL C. FLYNN
SPECIAL AGENT
HOMELAND SECURITY
INVESTIGATIONS

Subscribed and sworn to before me
on March 26, 2014

Marianne B. Bowler, USMJ
HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE